IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 26, 2005

## CALVIN J. GRISSETTE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2002-A-568      Steve Dozier, Judge**

_____

**No. M2005-00233-CCA-R3-PC - Filed November 18, 2005**

_____

The petitioner, Calvin J. Grissette, appeals the Davidson County Criminal Court's order dismissing his November 2, 2004 petition for post-conviction relief that challenged his 2003 convictions of second degree murder and attempt to commit second degree murder. In his petition, the petitioner claimed infirmity in his convictions due to the ineffective assistance of counsel. Because the record supports the post-conviction court's denial of relief, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Dwight Scott, Nashville, Tennessee, for the Appellant, Calvin J. Grissette.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck and Pamela Sue Anderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

Following his jury trial and convictions, the petitioner appealed, and this court affirmed the convictions. *See State v. Calvin Grissette*, No. M2003-02601-CCA-R3-CD (Tenn. Crim. App., Nashville, Sept. 2, 2004). The petitioner filed no application for permission to appeal to the Tennessee Supreme Court. The petitioner is serving an effective 23-year sentence in the Department of Correction. Following the timely filing of the petition for post-conviction relief now under review, the criminal court appointed counsel and conducted an evidentiary hearing.

A review of the facts underlying the convictions was presented in this court's opinion in *Calvin Grissette*:

Yannick Deslauriers, an officer with the Metropolitan Police Department, testified that, in the early morning hours of October 24, 2001, he responded to a call from dispatch regarding "shots fired" in the Edgehill area of Nashville. Officer Deslauriers stated that, when he arrived at the scene, he found one of the victims, Kenneth Battle, lying on the ground, and the victim appeared to be dead. The officer stated that he did not find a gun at the crime scene, but did interview a witness to the shooting, Chereta Jones. Officer Deslauriers estimated that less than two minutes elapsed between dispatch's announcement of the shooting and his arrival on the scene.

Mikell Wiggs, an officer with the Metropolitan Police Department, testified that he was dispatched to the Edgehill area in the early morning hours of October 24, 2001. Officer Wiggs testified that, upon arriving at the scene, he heard people shouting, "He's back here," to indicate to him where one of the victims was located. The officer explained that, one of the victims, Battle, appeared "dead" and was lying on the ground when he arrived. Officer Wiggs testified that he ordered another officer to put up crime scene tape around the victim's body. He stated that he did not find a gun at the crime scene, though he did find several shell casings near Battle's head.

On cross-examination, Officer Wiggs explained that, in his experience, evidence was sometimes removed from crime scenes. The officer stated that the police later found "a bag of dope" underneath the victim's body. Officer Wiggs estimated that between two and five minutes elapsed between the time of the dispatch call and the time that he arrived on the scene.

James Dobbins testified that he knew the Defendant, though not well. Dobbins stated that on October 24, 2001, he was watching a dice game in front of an Edgehill home with about ten other people, including Chereta Jones. According to Dobbins, when the dice game ended, he heard Battle's voice coming from around the corner of the building, and he saw the Defendant walk in Battle's direction. Dobbins testified that he witnessed the Defendant shoot Battle several times. Dobbins further stated that no words were exchanged between Battle and the Defendant prior to the shooting. Dobbins testified that he wrapped Battle in towels to prevent him from bleeding to death. He said that Battle did not have a gun.

On cross-examination, Dobbins stated that Battle talked about having guns but did not carry a gun. Dobbins stated that the

Defendant walked quickly down the sidewalk toward Battle immediately before the shooting. He stated that Battle did not raise his hand or make any other motion that might indicate that he had a gun.

E. J. Bernard, a detective in the Homicide Division of the Metropolitan Police Department, testified that he was dispatched to the homicide scene after Battle had been transported to Vanderbilt Hospital. Detective Bernard stated that, at the crime scene, he saw "what appeared to be approximately five or six forty-five caliber shell casings, [what] looked like a black hat, possibly a stocking cap of some type, and a white, rocky, powdery stuff that appeared to be cocaine in a plastic bag." He explained that Chereta Jones was a witness to the shooting and that she identified the Defendant as the shooter in a photo lineup of approximately four hundred pictures.

Chereta Jones testified that Battle, the deceased victim, was her son's father. She testified that, at about 3:00 a.m. on October 24, 2001, she was in front of a house in Edgehill watching a dice game with several other individuals when she saw the Defendant come around the corner of the building and shoot Battle seven or eight times. Jones stated that she could not see who shot Battle until the shooter began to run away, at which point she recognized the Defendant as the shooter. She testified that, after the Defendant fled, she recognized Battle as the victim and called an ambulance. She said that the Defendant did not exchange any words with Battle before he started shooting. Jones estimated that the Defendant stood in the area of the dice game between five and ten minutes before Battle arrived and the Defendant shot him. She testified that there were no weapons in the area after the shooting.

On cross-examination, Jones testified that Battle had a reputation "as a robber," but maintained that he wasn't known to carry a gun. She stated that, at the time of the shooting, Battle did nothing to indicate that he might have a gun. Jones said that Battle attempted to knock the gun out of the Defendant's hand as the Defendant was shooting him. Jones stated that the building where the shooting occurred did not have an exterior light on.

Charles Freeman, a detective with the Homicide Division of the Metropolitan Police Department, testified that, when he arrived at the crime scene, two officers briefed him. Detective Freeman stated that Battle "had numerous gunshot wounds [on] the left side of

his body." The detective testified that a doctor at Vanderbilt University Hospital removed a bullet from the victim's body and gave it to the detective. Detective Freeman stated that he interviewed Michael Mimms, a witness to the shooting, at the police station. The detective explained that Mimms identified the Defendant from a photo lineup as the individual who shot Battle. Detective Freeman testified that he then went to addresses used by the Defendant in the past and located the Defendant's mother, who convinced the Defendant to turn himself in and speak with the detective. Detective Freeman said that, after interviewing the Defendant at the police station, he returned to the Defendant's mother's house to search it, with the mother's permission. The detective stated that he found a hand gun in a crawl space underneath the house. Detective Freeman testified that the Defendant told him where to find the gun.

Daniel Orr, an officer with the Identification Section of the Metropolitan Police Department, testified that, on October 24, 2001, he responded to a dispatch call regarding a shooting in the Edgehill area of Nashville. Officer Orr stated that he collected evidence at the crime scene, including six bullet shell casings, a small bag of what appeared to be crack cocaine, a small paper sack and a "black toboggan hat."

Earl D. Hunter, a crime scene investigator with the Metropolitan Police Department, testified that he took photographs of the gun found at the Defendant's mother's home, the opening to the crawl space where the gun was found, and the exterior of the home. Officer Hunter stated that, when he found the gun, its magazine was empty.

Michael Mimms testified that he was eighteen years old and that he had been a friend of Battle, the deceased victim. Mimms testified that, in the early morning hours of October 24, 2001, he was at his home with a few friends, including Battle, smoking and playing video games. Mimms testified that he and his friends began to get bored and decided to make some money by selling cocaine. Mimms stated that he and Battle shared a cigarette outside the building. Mimms testified that their mood was jovial and that they were "just . . . chilling." Mimms said that he and Battle went to watch the dice game that was being played on the other side of the building. Mimms stated that, as he and Battle approached the game, they were talking with one another. He explained that, as they approached the corner of the building, "it got pretty quiet," and the Defendant "stepped out

-4-

and started shooting." Mimms stated that the Defendant was wearing dark clothing, a coat, and a stocking cap over his head, with his face still visible. Mimms testified that the Defendant fired the gun from a range of five or six feet and said nothing before or during the shooting. Mimms stated that he saw "flames kicking out the end" of the gun as the Defendant fired it "six or seven times. My guess would be [that he used] the whole clip." Mimms testified that, as the Defendant began to fire, he ran away, but felt "a sharp little sting" in his leg. Mimms stated that he returned to his home to tell his mother what had happened when he discovered that he had been shot in the left calf. He stated that he then called the police. He testified that he identified the Defendant as the shooter from a photo lineup. Mimms stated that Battle did not have a gun with him on the night of the shooting. Mimms explained that he was approached by one of the Defendant's friends who said that he would give Mimms five or six hundred dollars if he would report that Battle was carrying a gun when the shooting occurred. Mimms said that, after being bribed by the Defendant's friend, he told a private investigator that Battle was carrying a gun on the night of the shooting, though he told the investigator that Battle did not "pull it out." Mimms testified that he subsequently told the truth at the preliminary hearing when he stated that Battle did not have a gun.

On cross-examination, Mimms stated that Battle did not own a gun but that he knew Battle occasionally carried a gun. Mimms testified that, just prior to the shooting, the Defendant "had to be watching us the whole time because he anticipated our every move because we didn't know he was there, but he knew we [were] coming."

Kendall Jaeger, a firearm and tool mark examiner with the Metropolitan Police Department, testified as an expert in the field of firearm and tool mark identification. Jaeger testified that he inspected the gun that police officers found under the Defendant's mother's house. He stated that the gun was a forty-five caliber semi-automatic Colt firearm. Jaeger testified that the gun's magazine held seven rounds. He stated that the gun would not fire unless the safety had been disengaged and that the gun would fire only once for each pull of the trigger. Jaeger also stated that the trigger on the gun had a pull weight of just over nine pounds. He explained that the gun would eject each spent casing as soon it was used out the right side of the gun, but that fact would not guarantee the position in which a given spent casing would land relative to the gun. Jaeger stated that,

according to his analysis, the spent casings found at the crime scene came from the gun found in the crawl space under the Defendant's mother's home, and the bullets extracted from Battle's body were fired from the gun.

Dr. John E. Gerber, an expert in forensic pathology, testified that he performed an autopsy on Battle on October 24, 2001. Dr. Gerber stated that he found multiple gunshot wounds on the body. The doctor said that the body had bullet wounds to the left back of the neck, the left side of the mid-back, the left side of the chest, and the left arm. Dr. Gerber stated that there was also an abrasion on the right eyebrow, consistent with a fall. The doctor testified that the bullets' paths through Battle's body indicated a general left to right direction. He explained that Battle had cocaine in his system when he died.

The Defendant called Bobby Brown, a licensed private investigator and paralegal, to testify. Brown testified that he had been involved in the investigation of the Defendant's case "from the start." Brown testified that he did not offer Michael Mimms any money to make a statement about Battle. On cross-examination, Brown testified that the person who put him in touch with Michael Mimms was Thomas Thompson. He stated that he was not present during every conversation Thompson had with Mimms.

*Id.*, slip op. at 1-5.

In the post-conviction evidentiary hearing, the petitioner's trial counsel, a veteran criminal-defense lawyer, testified that he was retained to represent the defendant at trial. He testified that, based upon his investigator's interview with Tommy Thompson, in which Mr. Thompson said that the victim had a gun prior to being shot, counsel believed that the theory of defense should be self-defense. Counsel, however, could not locate Mr. Thompson, despite his and his investigator's three-week efforts to "track Mr. Thompson down at his various girlfriends' mother, grandmother's house."

Counsel testified that he did not move to suppress the petitioner's pretrial statement to police because he discerned no legal cause for suppression. He also pointed out that the statement contained the defendant's elucidation of his imminent fear of the victim and his belief that the victim was armed. Counsel opined that admission of the statement at trial would have injected the issue of self-defense into the trial and would have justified a jury instruction on self-defense without the petitioner having to testify; however, the state did not offer the statement into evidence at trial.

Counsel testified that his voir dire examination of prospective jurors was heavily skewed toward self-defense as a justification for the killing of the victim, and counsel explained to the petitioner that the trial court would give the jury no instructions on self-defense unless the issue was raised by the evidence. Counsel testified that he explained to the petitioner the need for him to testify to insert a self-defense claim into the evidence. Despite discussions of the need for the petitioner's testimony and a lengthy trial recess during which counsel discussed the issue with the petitioner and his parents, the petitioner declined to testify. Counsel testified that he explained to the petitioner his rights concerning giving testimony, that counsel "couldn't force him to [testify], it . . . had to be his choice." Counsel emphasized that the petitioner was aware that his decision to not testify would result in the absence of jury instructions on self-defense. Counsel opined that the petitioner declined to testify because, under oath, the petitioner could not articulate a basis for a claim of self-defense.

Counsel testified that he and his investigator met with the petitioner on various occasions prior to trial and that counsel received an "extensive amount of discovery" pursuant to the state's open-file discovery policy.

Counsel acknowledged that he did not challenge the petitioner's sentencing by the trial judge pursuant to *Apprendi*.

The petitioner testified in the evidentiary hearing that he was held in jail approximately two years awaiting trial. Despite the long delay, he first met with counsel the day before trial. The petitioner testified, "I'd never see [counsel]. I didn't never [sic] see him. I – I never – every time I'd go to court, I never seen him, I never talked to him, I never really met him."

The petitioner acknowledged that he "didn't tell [counsel] that [he] wasn't gonna [sic] get on the stand until the day of trial. And, so, he was thrown off from that point on." The petitioner testified that counsel did not "clarify" that the petitioner should testify until during the trial, and the petitioner then told counsel, "I'm not gonna [sic] get on the stand."

The petitioner testified, "At the time, . . . I was in the word of God; and I didn't wanna [sic] get on the stand, 'cause I didn't . . . wanna [sic] say anything that might . . . be not the truth, not as far as the self-defense-wise." Nevertheless, the petitioner believed that he was not sufficiently prepared by counsel to testify at trial. The petitioner testified that he lied when, during a voir dire relative to his decision not to testify, he stated that counsel had informed him about his rights about testifying and the consequences of the available alternatives.

In its written order denying post-conviction relief, the criminal court made the following findings as are pertinent to the issues presented on appeal:

> 1. Trial counsel diligently searched for prospective witness Tommy Thompson and did not perform deficiently when he failed to locate Mr. Thompson and to call him as a witness at trial.

2. Accrediting the testimony of trial counsel, counsel "visited the petitioner multiple times and conferred with him and adequately advised him in preparation for trial," and the petitioner chose, "after much consultation with his counsel and counsel's discussion with [the] petitioner's parents, not to testify."

On appeal, the petitioner claims that his trial counsel rendered ineffective assistance by failing to prepare the petitioner to testify at trial, failing to meet with the petitioner adequately before trial, and failing to fully investigate the circumstances of the victim's death.

In a post-conviction proceeding, the petitioner bears the burden of proving the grounds raised by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a claim of ineffective assistance of counsel presents a mixed question of law and fact subject to *de novo* review. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). As such, the post-conviction court's findings of fact are entitled to a presumption of correctness unless the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court and, on appeal, the burden is on the petitioner to prove that the evidence preponderates against the post-conviction court's findings. *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). However, a post-conviction court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are subject to a purely *de novo* review with no presumption of correctness. *Fields*, 40 S.W.3d at 458.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Moreover, "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

An important corollary to the prejudice rule, is that when a petitioner alleges that counsel ineffectively assisted the petitioner at trial by failing to locate or call a prospective witness, the petitioner must establish what the witness' testimony would have been by presenting the witness in the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("[W]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses

in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing"; otherwise, the petitioner is not entitled to relief.).

In the present case, trial counsel testified to his strategies and actions, which when accredited by the post-conviction court, placed his performance within the range of competency required of attorneys defending criminal cases. Dispositively in this case, the post-conviction court accredited counsel's testimony and discredited much of the petitioner's testimony. As a result, the record supports the post-conviction court's determination that counsel adequately prepared the case, counseled fully consulted with the petitioner, and diligently searched for a prospective witness.

Additionally, the record demonstrates that the petitioner failed to show that he was prejudiced by any claimed deficiencies of counsel. We point out that, with respect to the absence of Tommy Thompson at trial, the petitioner did not present Mr. Thompson in the evidentiary hearing and, consequently, did not establish that he was prejudiced by Mr. Thompson's failure to testify at trial.

The record also establishes that counsel labored extensively to educate the petitioner on the need for his testimony along the lines of the pretrial statement he had given the police. Nevertheless, despite knowing that his failure to testify would result in the absence of a basis for a self-defense claim, the petitioner decided voluntarily and wilfully to not testify. Moreover, in the post-conviction hearing, the petitioner failed to reveal how his trial testimony would have enhanced his defense.

We hold that the record supports the criminal court's denial of post-conviction relief and affirm the order dismissing the petition.

_____
JAMES CURWOOD WITT, JR., JUDGE